# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 15 C 1788** |
| | ) | |
| **MASON M. JOHNSON,** | ) | **Judge Rebecca R. Pallmeyer** |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

On July 12, 2012, a jury convicted Petitioner Mason Johnson of conspiracy and bank robbery. The following year, this court sentenced Johnson to 220 months in prison. Johnson appealed, but the Seventh Circuit affirmed his conviction and sentence on February 28, 2014. *United States v. Johnson*, 745 F.3d 227, 231 (7th Cir. 2014). Johnson has now petitioned this court to vacate or set aside his conviction and sentence under 28 U.S.C. § 2255, on the grounds of ineffective assistance of counsel. (*See* Motion to Vacate or Set Aside Judgment and Sentence [1] ("Def.'s 2255 Mot.").)

Johnson claims that his trial and appellate attorneys were ineffective in a variety of ways. Johnson contends that trial counsel, Ralph J. Schindler, Jr., failed to present testimony regarding Johnson's alibi for the time of the bank robberies, and failed to interview two "critical witnesses" who Johnson argues would have supported his claim of innocence. (*Id.* at 2, 5.) Johnson further alleges that his appellate counsel, Beau B. Brindley, was ineffective because he "failed to research and argue" several issues which Schindler had previously identified in an unsuccessful motion for a new trial (*see* Order Denying Defendant's Motion for New Trial and for Judgment of Acquittal [108]), and in an early draft of Johnson's opening appellate brief. (*Id.* at 2, 9–12.) Finally, Johnson argues that his loss on appeal itself demonstrates Brindley's inadequacy (*Id.* at 9–12), because in its decision affirming his conviction, the Court of Appeals sanctioned Brindley for violations of the Federal Rules of Appellate Procedure. *Johnson*, 745 F.3d at 232.

For the reasons stated, Johnson's motion is denied. The record shows that Johnson is not entitled to relief, and this court concludes that no evidentiary hearing is necessary. Johnson's claims of ineffective assistance are either frivolous or, if counsel can be considered to have erred at all, did not influence the outcome of his trial and appeal.

## BACKGROUND

### I.    Pre-trial Proceedings

Johnson was charged in an indictment with conspiracy and three counts of bank robbery on February 15, 2012. (Indictment [Crim. 18].)[1] The charges stemmed from the robberies of three TCF Banks in the Chicago suburbs of Oswego and Aurora, Illinois, which occurred on December 20, 2010; December 22, 2010; and January 16, 2011. The Government also charged another man, Joseph Prince, as a co-conspirator and as a participant in the December 20th and January 16th robberies. (*Id.*) Prince pleaded guilty and agreed to cooperate against Johnson. (*See* Prince Plea Agreement [Crim. 62].)

Prior to trial, Johnson moved to suppress several pieces of evidence, most notably an out-of-court identification made by Amanda Williams—a friend of Prince's who unknowingly acted as the pair's getaway driver for the January 16th robbery. *Johnson*, 745 F.3d at 228. In her interview with the FBI, Williams identified a photograph of Johnson in a six-photograph array (referred to as a "six pack"). *Id.* Johnson moved to suppress this identification, claiming that the FBI's array was impermissibly suggestive. (Def.'s Motion to Suppress Identifications [Crim. 69] ("Def.'s Suppression Mot."), 1–3.) The court granted Johnson's motion in part and denied it in part. (7/3/12 Minute Order [Crim. 78].) In explaining its reason, the court did not comment on whether the array was, in fact, suggestive, but stated instead that defense counsel was free to cross-examine Williams on her level of certainty concerning the identification. (Pre-trial Conference Tr.

---

[1]    This court will refer to docket entries in Johnson's underlying criminal case, *United States v. Johnson*, No. 12-cr-32, as "[Crim. X]."

[Crim. 154], 4:6–5:21.)  The court limited Williams to the prior identification only, however, and prohibited her from making any in-court identification of Johnson:

> I think if all she's going to do it get on the stand and say "here's the photo spread I looked at, and I picked out this photo but I wasn't certain," there's really no impropriety in that.  You know, the real problem is when the photo spread . . . creates a memory as opposed to simply confirm[s] a memory.

(*Id.* at 5:15–17.)

During jury selection, the court dismissed several prospective jurors for cause.  One of them, Juror No. 2, was dismissed based on doubts that she would be able to stay awake, attentive, and impartial during the trial.  Juror No. 2 told the court that she "kept falling asleep" during *voir dire* and would likely continue to do so during the trial: "when I am sitting not doing nothing and I am bored, I just doze off.  So I might not hear everything because I might be falling asleep."  (Trial Tr. Vol. 1 [Crim. 145], 119:7–120:25.)  Her answers also raised some concerns over her ability to be objective.  (*Id.*)  When asked by the court whether she would base her decision on the evidence or her own beliefs, Juror No. 2 repeatedly gave non-committal answers and appeared to be either bored or confused by the line of questioning.  (*See* Trial Tr. Vol. 1-B [Crim. 146], 169:15–174:22.)  The prosecution moved to dismiss Juror No. 2 for cause, noting "her attitude towards being inattentive and being able to stay awake" and her general "dismissiveness and [ ] malaise" towards the court's questions.  (*Id.* at 175:7–24.)

Defense counsel objected on the basis that Juror No. 2 was African-American—like Defendant—and one of only four or five African-American jurors in the panel.  (*Id.* at 177:5–6; Trial Tr. Vol. 1 at 121:7–13.)  The court recognized defense counsel's concern, but reminded him that "race is not an issue for a cause challenge, and it would be an issue only if I felt somebody was using it as a factor in a peremptory challenge."  (Trial Tr. Vol. 1-B at 177:7–9; *see also* Trial Tr. Vol 1 at 123:2–20) ("Like every other judge in this building, I share your concern about race balance on juries.  It drives me nuts that we have such difficulty getting a balance.").  The court ultimately dismissed Juror No. 2 for cause:

Her—her demeanor really troubles me. I had the distinct impression, A, that she wants out; B, that she's—she's not willing to . . . make eye contact. She's very skittish and uncomfortable. She said a couple of times that she would be bored. She volunteered in her—in her questionnaire that she would be sleepy. And she also volunteered that she might get her mind made up. Now, you're right that her answers rehabilitated that [latter] aspect of her questionnaire to a certain degree, but she really never rehabilitated herself on attentiveness. And her very grave unwilling demeanor really makes me nervous.

(Trial Tr. Vol. 1-B at 177:7–20.)

## II. Trial

At trial, Joseph Prince testified that he and Johnson planned and executed the robberies together. According to Prince, it was Johnson who first suggested robbing a bank. (Trial Tr. Vol. 2-B [Crim. 148], 392:19–396:8.) Prince eventually agreed to Johnson's plan after Johnson convinced him that they would not need a gun and suggested that Prince would "probably [just] get probation" if they got caught. (*Id.*) Prince testified that he helped Johnson commit the first and third robberies, but that Johnson committed the second robbery on his own. (*Id.* at 415–17.) Hours after that second robbery, Prince recalled, Johnson told Prince that "he did it again" and that Prince should have come along because Johnson managed to steal $5,000. (*Id.*) ($4,044 was actually taken from the second bank). Overall, Prince provided numerous details regarding the robberies, including the robbers' preparations, the amounts they stole, what they were wearing, and the wording of the demand notes. (*Id.* at 396–413, 420–38.) Prince also identified himself and Johnson in the banks' surveillance videos, and recognized the demand notes taken from the crime scenes and introduced as evidence.[2] (*Id.* at 408–13, 427–34; *see also* Trial

---

[2] The demand notes were further linked to Johnson by one of the prosecution's fingerprint experts, who identified three of Johnson's fingerprints and nine of Prince's on the demand note from the first robbery. (Trial Tr. Vol. 2 at 335:10–23; Trial Tr. Vol. 2-B at 354:10–355:3.) The prosecution's other fingerprint analysts were unable to develop prints suitable for comparison on the demand notes from the second or third robberies, or from surfaces in the second and third TCF Banks. (*See generally* Trial Tr. Vol. 3 at 505–15.) But the demand note from the third robbery was written on the back of an inspection notice from the Harbor Village Apartments—an apartment complex where Johnson had been living with a series of girlfriends and where Johnson and Prince met before each robbery. (Trial Tr. Vol. 2-B at 400, 406, 419–21, 426–28.)

Exhibits, Ex. 1 to Government's Motion to Supp. the Record on Appeal [Crim. 141-1] ("Trial Exhibits").)

Amanda Williams became involved when Prince called and asked her to give him a ride on January 16, 2011. (*Id.* at 422–23.) Williams had known Prince for several years; she did not know Johnson. (Trial Tr. Vol 3 [Crim. 149], 517–20.) Prince did not tell Williams that he and Johnson were going to rob a bank. (*Id.*) Williams drove them to a Jewel/Osco store in Aurora where Williams waited in her car while Johnson and Prince entered and went to the TCF Bank located inside. (*Id.* at 529–33.) After robbing the bank, they returned to Williams's car and yelled at her to leave quickly. At that moment, the dye pack hidden between the stolen bills exploded in Prince's pants pocket and pink smoke engulfed the passenger compartment. (*Id.* at 534–35.) Williams screamed at the two men to get out of her car and drove away, leaving them in the Jewel/Osco parking lot.[3] (*Id.*) Johnson and Prince ran into the nearby woods to hide, where they quickly realized that, in the confusion of the moment, Johnson had left his cell phone in Williams's car. (Trial Tr. Vol 2-B at 436:6–437:17.) Williams found Johnson's phone—a red BlackBerry which featured an image of Johnson as a screensaver—in the back seat of her car later that day. (Trial Tr. Vol. 3 at 536–39.) Williams held on to the phone and ignored the two men's attempts to contact her and recover it. (*Id.* at 540–44.) Williams turned the phone over to the FBI on January 25, 2011, when they approached her about the robbery. (Trial Tr. Vol. 2 at 296–97) (testimony of FBI Special Agent James Ferguson). Williams also testified about her interview with the FBI, mentioning that she had identified Johnson's image in the photo array. (*Id.* at 301–06; Trial Tr. Vol. 3 at 520–23.)

Johnson's ex-girlfriend, Carlita O'Neal, also testified for the prosecution. O'Neal identified the red BlackBerry that the FBI obtained from Williams as Johnson's. (Trial Tr. Vol. 3 at 568–69.)

---

[3]     Prince's testimony regarding the January 16th robbery mirrored Williams's. (*See* Trial Tr. Vol. 2-B at 422–35.)

She then identified Johnson in the banks' surveillance videos by his appearance and by his clothing: specifically, a "black vested hoodie jacket" with gray sleeves that Johnson was shown wearing during the robberies on December 20 and 22; a navy and red baseball hat with a large, white "A" that he wore during the December 22nd robbery; and a black jacket with a silver emblem on the left breast and large wings on the back that Johnson wore during the final robbery on January 16th.[4] (*Id.* at 585–86. *See also* Trial Tr. Vol. 2 at 279–93) (testimony by Agent Ferguson describing the surveillance videos). O'Neal recognized the second jacket, which was taken from Johnson by the police and introduced as an exhibit during the trial, as one that Johnson purchased in her presence on January 2, 2011: a Stall and Dean brand jacket with large wings and the phrase "Wichita Aviators" on the back and a logo featuring a winged letter "A" on the breast. (Trial Tr. Vol. 3 at 574–76.) O'Neal stated that she threw Johnson's black and gray hoodie jacket in the garbage sometime in February 2011 after Johnson moved out of her apartment to move in with another woman. (Trial Tr. Vol. 3-B [Crim. 150], 617:16–618:23.)

Defendant sought to undermine O'Neal's testimony by portraying her as a jealous, vindictive ex. (*See, e.g.,* Letter from Ralph J. Schindler to the Court of 6/29/12 [Crim. 103] ("Schindler Letter"), 2.) O'Neal had testified to the grand jury that she first became aware of the bank robberies (and Johnson's involvement) when a friend posted, on O'Neal's Facebook wall, a link to a WGN news story about the robberies. (*Id.*) Defendant claimed that O'Neal was lying about the Facebook post, and believed that she had manufactured her entire story to get revenge on Johnson—who had been cheating on her with another woman who lived in the apartment complex. (*Id.*) To counter O'Neal's testimony, Defendant issued a subpoena to Facebook for records of O'Neal's account. Facebook objected to the subpoena, asserting that the Stored Communications Act ("SCA"), 18 U.S.C. §§ 2801 *et seq.*, prohibited it "from divulging the content

---

[4]    A "selfie" photograph recovered from Johnson's BlackBerry depicted him wearing these same items of clothing less than two hours after the first robbery. (Trial Tr. Vol. 3-B at 706:18–707:18; Trial Exhibits at 14.)

of a user's communications to private parties, including criminal defendants." (Non-Party Facebook, Inc.'s Motion to Quash Subpoena Duces Tecum [Crim. 101] ("Facebook Mot."), 1–2.) Facebook insisted that Johnson was free, however, to obtain the records from the account holder, O'Neal. (*Id.*) Defense counsel argued that Facebook's refusal to cooperate violated Johnson's Sixth Amendment rights (Schindler Letter 2–3), but the court granted Facebook's motion to quash the subpoena, and defense counsel was ultimately able to obtain the evidence from O'Neal herself. These records revealed that no link to any news story about the robberies appeared on her Facebook wall.

At trial, however, O'Neal revived her claim that she first recognized Johnson in a news story posted to her Facebook wall. (Trial. Tr. Vol. 3-B at 596.) O'Neal said that the reason the link no longer appeared was because the individual who sent it is no longer on Facebook. (*Id.* at 596:3–597:19.) Defendant cross-examined O'Neal vigorously. (*Id.* at 598:8–600:17.) Throughout her testimony, O'Neal freely admitted that her relationship with Johnson was volatile (during one fight, the two threw bleach over each other's clothing; during another, she broke her leg while chasing him through a parking lot with a sharp object), that Johnson moved out after O'Neal found out he was cheating on her, and that she later threw away much of the clothing he had left behind. (*Id.* at 600:18–609:5, 617:16–619:15, 631:7–632:15; Trial Tr. Vol. 3 at 569:15–570:8, 576:21–580:19, 588:22–589:6.)

As a final effort to connect Johnson to the December 22nd robbery—the one he committed without Prince—the Government introduced a photograph pulled from Johnson's cell phone. (Trial Tr. Vol. 3-B at 707:19–709:7; Trial Exhibits at 15.) This photograph was taken by Johnson's phone camera about an hour after the December 22nd robbery and depicted a large pile of cash in an African-American man's lap. (*Id.*) The man's head was not visible in the image. The bills were stacked on top of each other, so the full faces and denominations of most of the bills were not apparent—although several $20s and at least one $10 bill and one $5 bill can be seen. (*Id.*) The defense theorized that because the demand note from the December 22nd robbery

specifically asked for large bills, the money shown in the photograph could not have been the proceeds of that robbery. (Trial Tr. Vol. 4 [Crim. 151], 756:24–759:19; *see also* Trial Tr. Vol. 4-B [Crim. 152], 819:14–820:7) (Defendant's closing argument). Defense counsel, however, did not object to the admission of this photograph at trial. (Trial Tr. Vol. 3-B at 697:19–25.) In addition, neither side introduced evidence of the exact denominations of the stolen bills. The closest accounting came from bank teller Alma Hamzic, who stated only that "I started going for the 10s, because my drawer is organized in denominations. And then at that point, I was told, you know, large bills, 100s, 50s, 20s." (Trial Tr. Vol. 1-B at 233:9–235:9.) Nevertheless, defense counsel questioned the FBI case agent, James Ferguson, about the bills in the photograph in the attempt to cast doubt on whether they matched the denominations that Hamzic mentioned during her FBI interview or that TCF Bank noted in its post-robbery audit. (Trial Tr. Vol. 4 at 744–51.) The Government objected to much of this line of questioning as hearsay, for lack of foundation, for mischaracterizing Hamzic's testimony, and as an improper attempt to impeach Hamzic through Ferguson. (*Id.* at 744–51, 756–59.) The court sustained the Government's objections. (*Id.*) Ferguson did admit that he had not compared any of the stolen bills' serial numbers to the few serial numbers that were visible in the photograph, but explained that was because TCF Bank itself did not keep track of serial numbers. (*Id.* at 750:24–751:22.) In his closing argument, defense counsel again argued that the money in the photograph could not have been the proceeds of the December 22nd robbery because the note demanded $20s, $50s, and $100s, and no $50s or $100s are visible in the photograph. (Trial Tr. Vol. 4-B at 819:14–820:7.)

The jury found Johnson guilty on all four counts. (*Id.* at 853.) Johnson moved for a new trial [91] and for acquittal [92]. In his motions, Johnson challenged the court's dismissal of Juror No. 2, his inability to subpoena O'Neal's Facebook records from Facebook itself, the FBI's photographic lineup procedure, and the Government's use of the picture of cash found on Johnson's cell phone. (*See* Motion for New Trial [91].) The court denied both motions. On February 1, 2013, the court sentenced Johnson to 220 months imprisonment.

### III.    Appeal

Johnson's trial attorney filed a timely notice of appeal in February 2013 and, according to Johnson, prepared a first draft of an opening brief in which he raised the same four arguments addressed in Johnson's Motions for New Trial and Acquittal. (Def.'s 2255 Mot. 9.)  On July 26, 2013, however, Johnson retained a new attorney, Beau B. Brindley.  By this point, the Court of Appeals had already extended the deadline for Johnson's opening brief three times.  *Johnson*, 745 F.3d at 231.  The court then granted one, final six-week extension to give Brindley time to prepare.  Brindley claimed that the additional delay was necessary because Schindler had neglected to order the transcript from the July 3, 2012 pre-trial conference during which this court gave its reasons for denying Johnson's motion to exclude Amanda Williams's photo-array identification of Johnson.  *Id.*  On September 9, when his six weeks were up, Brindley had still not obtained the missing transcript.  He requested another extension—which the Seventh Circuit denied.  *Id.*

Brindley's brief ultimately advanced only one of the arguments proposed by Schindler: that Williams's out-of-court identification of Johnson was influenced by the FBI's "unnecessarily suggestive" photo array.  (Def.'s 2255 Mot. 9.)  The Court of Appeals rejected this argument and affirmed Johnson's conviction on all counts, holding that this court did not err in permitting Williams and Agent Ferguson to testify about the out-of-court identification.  *Johnson*, 745 F.3d at 228– 30.  The court recognized that it has expressed a preference for police to "show photographs sequentially rather than as part of an array," but it declined to adopt a bright-line rule against the use of photo arrays.[5]  *Id.* (citing *United States v. Ford,* 683 F.3d 761, 764–65 (7th Cir. 2012)).  Rather, it evaluated the photo array used in this case against the framework summarized in *Perry v. New Hampshire*, 565 U.S. 228 (2012), which states that an identification should only be suppressed if the procedure was (1) "suggestive and unnecessary," and (2) resulted in a

---

[5]    In fact, the court noted that recent research has called its previous doubts about photo arrays into question.  *Johnson*, 745 F.3d at 229.

"substantial likelihood of misidentification" that the adversarial processes of trial cannot overcome.

*Id.* at 238–39. The Court of Appeals held that this court did not err in concluding that the FBI's

"six pack" photo array was not unnecessarily suggestive:

> [A]ll six photos met Williams's description: a bald black man with a small amount
> of facial hair. . . . All six men also were in the same clothing and photographed
> against the same background. Johnson's lawyer observes that the men have
> different skin coloration, but that is inevitable in any array or sequence of photos—
> just as it is inevitable that the facial hair, ear sizes, and chin shapes will not be
> identical. A "lineup of clones is not required." *United States v. Arrington,* 159 F.3d
> 1069, 1073 (7th Cir. 1998). . . . Nothing about this array makes the photograph of
> Johnson (#3) stand out.

*Johnson*, 745 F.3d at 229–30.

The Seventh Circuit devoted the remainder of its opinion to a collateral issue: the conduct

of Johnson's attorney during the appeal. Despite pushing for multiple delays in order to obtain

the transcript from the pre-trial conference, the court observed, Brindley failed to include that

transcript in the appellate record. *Id.* at 231. He then falsely certified that his brief's appendix

included all the materials required by the Seventh Circuit's local rules and the Federal Rules of

Appellate Procedure. *Id.* The Court of Appeals recognized this as an elaborate attempt to portray

the district court's adverse evidentiary ruling in a bad light. "Anyone reading Brindley's brief would

think that the court had no reasons—that the decision was wholly arbitrary." *Id.* Even after the

Government quoted a portion of the transcript in its response brief, Brindley continued to "choos[e]

deceit over assistance to the court" and ignored the district court's statements in his reply brief,

"proceed[ing] as if the district court judge neither had nor gave any reason for her decision."[6] *Id.*

at 232. The Court of Appeals concluded by reprimanding and sanctioning Brindley:

> Brindley may not have set out to develop a reputation as a lawyer whose word
> cannot be trusted, but he has acquired it. This opinion serves as a public rebuke
> and as a warning that any further deceit will lead to an order requiring Brindley to
> show cause why he should not be suspended or disbarred. We also direct Brindley
> to pay $2,000 as a sanction for his intentional violation of Circuit Rule 30(d).

---

[6] The Court of Appeals did eventually receive the transcript, and relied on it both to
decide Johnson's appeal and as evidence of Brindley's deceit. *Id.* at 231.

*Id.* (noting in addition that Brindley's "deliberate deceit" was "a mighty strange decision" coming from a lawyer who had recently been held in contempt for lying to another federal judge).

<u>**DISCUSSION**</u>

Relief under 28 U.S.C. § 2255 "is available only in extraordinary situations, such as an error of constitutional or jurisdictional magnitude or where a fundamental defect has occurred which results in a complete miscarriage of justice." *Blake v. United States,* 723 F.3d 870, 878–79 (7th Cir. 2013). A petitioner may raise an ineffective assistance of counsel claim regardless of whether he could have raised the claim on direct appeal. *Massaro v. United States*, 538 U.S. 500, 504 (2003). A petitioner asserting ineffective assistance of counsel must demonstrate that counsel's performance was deficient, and that he was prejudiced by that deficient performance. *Blake*, 723 F.3d at 879 (citing *Strickland v. Washington*, 466 U.S. 668, 687–90 (1984)). The deficiency prong requires the petitioner to show that his attorney's performance fell below an objective standard of reasonableness. *Id.* Courts are instructed to be "highly deferential" of counsel's strategic decisions, and there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Id.* The prejudice prong requires the petitioner to show that there is a reasonable probability that the result of the proceeding would have been different but for his counsel's errors. *Id.* District courts may dismiss a petition without holding an evidentiary hearing if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." *Boulb v. United States*, 818 F.3d 334, 339 (7th Cir. 2016) (quoting 28 U.S.C. § 2255(b)).

# I. Procedural Bar for the Lack of an Affidavit

As a preliminary matter, Johnson's present motion for collateral relief, filed by his third attorney, Heather L. Winslow, does not contain a sworn affidavit from Johnson detailing the specific facts he believes supports his claims of ineffective assistance of counsel. Such an affidavit is a threshold requirement, and its absence precludes the necessity of holding an evidentiary hearing to address the petitioner's claims. *Kafo v. United States,* 467 F.3d 1063, 1067 (7th Cir. 2006) (citing *Galbraith v. United States*, 313 F.3d 1001, 1009 (7th Cir. 2002). The Government objects to the Johnson's factual arguments, but requests that this court deny Johnson's motion without a hearing based on his procedural failure alone. (*See* Government's Response to Johnson's 28 U.S.C. § 2255 Motion [17] ("Gov't Resp. Br."), 16, 39–41.)

As Johnson's counsel notes, however, Johnson had good cause for his failure to attach an affidavit to his motion. At the time the motion was filed, Johnson was in the process of being transferred from one prison to another and was unable to communicate with his counsel. (*See* Reply to Gov't Resp. Br. [20] ("Def.'s Reply Br."), 2–3.) Johnson's counsel says she discussed this with the United States Attorney's Office on several occasions, and claims that the Government conceded that Johnson did not need to supplement his petition. (*Id.*) The parties also mentioned the issue during a hearing before this court on April 27, 2015. (*See* Minute Entry from 4/27/15 Hearing [9].) As a result, Johnson argues that the Government (now acting through a different Assistant United States Attorney) has waived this argument. In any event, Johnson asserts that his prior counsels' ineffective assistance is "evident from the bare record" and "submits that an affidavit would not contribute to the [c]ourt's finding in this case." (Def.'s Reply Br. 13–14.) Johnson nevertheless requests that the court grant him the opportunity to supplement the record with an affidavit rather than dismissing his motion on procedural grounds. (*Id.*)

The Court of Appeals has stated that, in cases where a petitioner fails to submit his allegations under oath, "the better practice is to give a petitioner an opportunity to conform his petition to procedural requirements." *Kafo*, 467 F.3d at 1069 (citing *Rules Governing Section*

*2255 Proceedings for the United States District Courts*, Rule 2, 2004 Amendments, advisory committee's note). While some district courts in this circuit have continued to dismiss motions under Section 2255 without an evidentiary hearing for a petitioner's failure to submit an affidavit, *see, e.g., Dagostini v. United States*, No. 06-C-1246, 2006 WL 3613225, *5 n.7 (E.D. Wis. Dec. 11, 2006) (distinguishing *Kafo*), this court concludes the proper remedy in this case would be to allow Johnson to file an affidavit elaborating upon any deficient allegations. *See Ryan v. United States*, 657 F.3d 604, 606–09 (7th Cir. 2011) (reversing the district court's decision to dismiss the petitioner's Section 2255 motion without an evidentiary hearing when the court could easily have instructed the petitioner to file a supplemental affidavit with further details). Because, however, Johnson asserts that "the facts necessary to establish all of the allegations made in the petition [are] either clear from the record or [are] not based on [his] personal knowledge," (Def.'s Reply Br. 3), this court is satisfied that it may assume Johnson could submit the necessary affidavit and will address his claims on their merits. *See, e.g., Blake*, 723 F.3d at 881–88 (refusing to remand for an evidentiary hearing where the court concluded that petitioner's meager allegations of deficient performance could not have changed the outcome of trial).

## II.    Ineffective Assistance by Trial Counsel

Johnson claims that Schindler's performance fell below an objective standard of reasonableness for two reasons. The first is that Schindler allegedly "failed to make a reasonable investigation into [two] witnesses that would have supported Mr. Johnson's claim of innocence." (Def.'s 2255 Mot. 5.) Johnson alleges that two women, Jasmine Jones and Angellia Head,[7] "provided information to the FBI which directly contradicted the prosecution's case" but were not interviewed by Schindler or called to testify at trial. (*Id.* at 3.) Johnson believes that "[b]ased on the reports of interviews provided to the defense, their testimony was unquestionably exculpatory"

---

[7]    The parties refer to Ms. Head as "Angela," "Angel," and "Angellia" at various points in their briefs. The court will use "Angellia" because it is the version given in her FBI interview. (*See* FBI Interview of Angellia Head on 4/6/11 ("Head FBI Interview"), Ex. 4 to Letter from Mason Johnson to the Court of 1/25/11 ("Johnson Post-Trial Letter") [Crim. 117].)

because the two women "identified a different set of individuals as being responsible for the robberies in question[.]" (*Id.* at 6–7.)

Even a cursory glance at the records of the FBI's interviews with Jones and Head shows this is not true. Jasmine Jones met with Agent Ferguson twice in June 2011. She told Ferguson that she believed her brother, Xxavier Jones, had robbed a Fifth/Third Bank in Woodridge, Illinois on April 3, 2010. (FBI Interview of Jasmine Jones on 6/2/11, Ex. A to Gov't Resp. Br. [17-1] ("First Jones FBI Interview"), 1–2; FBI Interview of Jasmine Jones on 6/7/11, Ex. B to Gov't Resp. Br. [17-2] ("Second Jones FBI Interview"), 1–3.) She also thought that another brother, David Jones, may have been Xxavier's accomplice. This robbery was not charged in the indictment, and there is no evidence to suggest that it was related to the charged robberies. Jasmine did not mention any other bank robberies during her two interviews.

Head corroborated Jasmine's story and mentioned that Jasmine had shared her suspicions about her brothers with Head in November 2010. (Head FBI Interview 1.) Head, herself the biological sister of the Joneses (but not of Jasmine), claimed she had several conversations with Jasmine and other family members regarding Xxavier's activities. (*Id.* at 2–3.) Head also told the FBI that she thought Xxavier and David were involved in another bank robbery that occurred in December 2010. (*Id.* at 1–2.) It is not clear from her interview whether this was a reference to either of the two robberies charged in this case, but FBI notes show she told agents that she had seen a news report about a December robbery and had asked Jasmine whether Xxavier might be responsible for it as well. (*Id.*) According to Head, Jasmine then viewed the surveillance footage on her computer and told Head that she recognized her brothers as the robbers. (*Id.*) Head herself, however, was not able to identify anyone in the image—either with Jasmine or, later, during her own interview with the FBI. (*Id.*)

"It is well recognized that counsel must engage in a reasonable investigation or come to a defensible decision that a particular investigation is unnecessary." *United States v. Lathrop*, 634 F.3d 931, 938 (7th Cir. 2011). When counsel decides that an investigation is unnecessary,

courts must determine whether that decision was reasonable given the circumstances, "applying a heavy measure of deference to counsel's judgment." *Id.* The Seventh Circuit has stated that a finding of deficient performance in such situations ultimately "depends on factors like counsel's overall diligence, the likely relevance of the witness's testimony, whether alternative ways of proving the point exist, and the strength of the government's case." *United States v. Best*, 426 F.3d 937, 945 (7th Cir. 2005). Putting aside, for the moment, what the investigation would have uncovered, Schindler *did* investigate whether the two women had any relevant information. (Affidavit of Ralph J. Schindler, Jr., Ex. C to Gov't Resp. Br. [17-3] ("Schindler Aff."), 1–2.) In an affidavit attached to the Government's opposing brief, Schindler states that he tried to contact the two women and even sent a private investigator to locate and interview them. (*Id.*) The investigator performed a skip trace and reached out to their last known addresses, but was not successful. (*Id.*) Investigations need not be successful in order to satisfy an objective standard of reasonableness. *See Lathrop*, 634 F.3d at 939 (finding that counsel's investigation was reasonable when the witness ignored counsel's attempts to contact him and counsel "was convinced that further attempts would be fruitless"). Schindler was not ineffective for declining to pursue Jones and Head if other defense strategies appeared more viable.

More importantly, however, there is no basis for concluding that testimony from either of these women would have made a difference in Johnson's trial. Johnson misleadingly insists that the April 3, 2010 bank robbery was connected to the robberies charged in this case, and claims that Jones and Head "identif[ied] two separate individuals as the bank robbers in at least *two* of the robberies." (Def.'s 2255 Mot. 6–7) (emphasis added). But the April 3rd robbery was not charged in this case. Furthermore, Head never identified anyone in the photographs from the December robbery. Head said only that Jasmine Jones told her that Jasmine recognized her brothers in the picture. But Jasmine did not repeat this information to the FBI during either of her interviews (which, notably, occurred after Head's). Head's testimony would therefore have been pure hearsay, and Jasmine, assuming she did identify her brothers and testified to that effect at

trial, could have been impeached by the government based on her statements to the FBI. In any event, there is no reason to think that the jury would have been convinced of Johnson's innocence by Jasmine's one-off identification when Prince had already identified *himself* in the robbery photos—not to mention the fingerprint evidence, Johnson's clothing and cellphone, and additional identifications and testimony from O'Neal and Williams.

Johnson appears to believe that it is inconceivable that two different pairs of young African-American men could commit bank robberies in different Chicago suburbs within the span of ten months. This is a frivolous argument. FBI statistics show that there were almost 350 bank robberies in the Chicago area between 2016 and 2017. *See* Mike Krauser, *Chicago Area Bank Robberies On The Decline In 2017*, CBS Chicago (Dec. 29, 2017, 1:38 PM), https://chicago.cbslocal.com/2017/12/29/chicago-area-bank-robberies-on-the-decline-in-2017/ (last visited July 20, 2018) §The details of the robberies are distinct enough for any jury to conclude that Jasmine Jones's possible identification was mistaken. Jasmine told the FBI that she recognized Xxavier in the April robbery photos based on his facial features and a distinctive black and white, "cow-printed" sweatshirt. (First Jones FBI Interview 1; Second Jones FBI Interview 1–2.) That robber also had paint covering his hands. Xxavier had been working as a painter, and Jasmine believed Xxavier used the paint to conceal his tattoos. (*Id.*) None of those details are present in the robberies for which Johnson was convicted. And, unlike the December robbery photos, Jasmine did not simply stumble across the April photos by watching the news— she had borrowed Xxavier's phone and noticed that he was tracking the investigation of that robbery on a website called "bandittrackerchicago.com." (*Id.*) Despite Johnson's efforts to link the crimes together, there is no serious argument that the April 3, 2010 robbery has any relationship to this case.

Johnson's second claim of ineffective assistance by his trial counsel concerns Schindler's alleged failure to investigate his alibi for two robberies: "the January 16, 2011, robbery and possibly another." (Def.'s § 2255 Mot. 4, 8.) Johnson told Schindler that he could not have

committed those robberies because "he was at the Gateway [drug] treatment center in Aurora on [those days] and that his whereabouts could be confirmed by his probation officer." (*Id.* at 4.) This argument has even less to recommend it than the previous one. Schindler states in his affidavit that he thoroughly investigated the matter and concluded it would not support Johnson's defense. (Schindler Aff. 2.) Schindler, predictably circumspect concerning his communications with his client, said that he sought Gateway's sign-in sheets for the dates of the robberies but discovered "that Gateway did not maintain sign-in sheets, or that the sheets that were there did not corroborate Johnson's claim." (*Id.*) He also subpoenaed the records of Johnson's urine tests during the time of the robberies, but, again, the results were disappointing: Schindler states that the records were either not responsive to his subpoena, "or that the records did not corroborate Johnson's [alibi]." (*Id.*) "If there had been a record showing that Johnson was at Gateway on the date of one of the robberies," Schindler insists, "I would have used it at trial." (*Id.*) Schindler also explains that there were strategic reasons not to offer evidence in support of Johnson's purported alibi:

> Further I recall that the issue of Johnson attending Gateway for urine tests could be problematic when I learned that Gateway is located at 400 Mercy Lane, Aurora, IL. This location is near the sites of the bank robberies charged in Counts Three [December 22, 2010] and Four [January 16, 2011] of the indictment. I was concerned that introducing evidence of his attendance at Gateway on the day of the robbery might place him in the vicinity of these two robberies near the time that they occurred, which could inculpate him rather than exculpate him.

(*Id.* at 2–3.) Schindler did not err by thoroughly investigating Johnson's alibi and deciding not to present evidence that could hurt his client's case. *See Stuckey v. Hulick*, 258 Fed. Appx. 891, 895 (7th Cir. 2007) (concluding that an attorney's decision not to call a witness who could not provide an alibi for the defendant, and in fact might have incriminated him, was both reasonable and non-prejudicial); *cf. Campbell v. Reardon*, 780 F.3d 752, 765 (7th Cir. 2015) ("[W]hen counsel has 'reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable'") (quoting *Strickland*, 466 U.S. at 691).

Schindler does not recall if Johnson told him to investigate whether Johnson's probation officer, Dawn Bushma, could corroborate Johnson's story about being at Gateway during the robberies. (*Id.* at 3.) Officer Bushma's statements to the FBI, however, make it clear that her testimony would not have been helpful. The FBI interviewed Bushma twice: once in early January 2011 after the December robberies, and again after the final robbery. Bushma was unable to identify Johnson in the surveillance photos with certainty, but she did tell the agents that "the black male in the puffy jacket [i.e., the black-vested jacket with gray sleeves from the December 20th and 22nd robberies] kind of looked like Johnson." (FBI Interview of Dawn Bushma on 1/12/11, Ex. D to Gov't Resp. Br. [17-4] ("First Bushma FBI Interview"), 1; FBI Interview of Dawn Bushma on 1/25/11, Ex. E to Gov't Resp. Br. [17-5] ("Second Bushma FBI Interview"), 1.) It does not appear that Bushma mentioned anything, helpful or unhelpful, about Johnson's alibi during either interview. (*Id.*) If Schindler can be considered to have erred by not contacting Bushma, his error was not prejudicial—especially considering the lack of corroborating evidence from Gateway itself.

Johnson has not established that his trial counsel was ineffective in any way.

### III. Ineffective Assistance by Appellate Counsel

In order to prevail on his claim of ineffective appellate counsel, Johnson must establish that his attorney ignored "significant and obvious" issues that were "clearly stronger" than the issues his attorney did raise. *Suggs v. United States*, 513 F.3d 675, 678 (7th Cir. 2008). As with the standard test for ineffective assistance, it must be reasonably likely that this failure changed the result of Johnson's appeal. *Id.* (citing *Strickland*, 466 U.S. at 694). Appellate counsel, Beau Brindley, made just one argument on appeal: that the "six pack" photo array was unnecessarily suggestive. Johnson contends that Brindley was aware of, but ignored, several additional bases for appeal—the same ones advanced in Johnson's unsuccessful motions for acquittal and for a new trial: (1) the court's decision to excuse an African-American juror from the jury pool for cause, (2) the alleged violation of Johnson's Sixth Amendment right to compulsory process when

Facebook successfully moved to quash the subpoena, and (3) the admission in evidence of a photo of cash from Johnson's cell phone. (Def.'s 2255 Mot. 9.) Finally, Johnson claims that Brindley's conduct before the Court of Appeals contributed to its decision to affirm Johnson's conviction, making Brindley's performance "unconstitutionally deficient from the moment he filed an appearance." (*Id.* at 9–10.)

None of these arguments have merit. Johnson mentioned two of them only in passing: "The likelihood of a reversal and a new trial would have been substantially greater still if appellate counsel had raised the other preserved issues including the improper admission of the cellphone picture of cash and the improper dismissal of a juror [for] cause." (*Id.* at 11; Def.'s Reply Br. 11) (same). Johnson makes no effort to show that these issues are significant, obvious, or stronger than Brindley's challenge to the FBI's photographic line-up procedures. Nor does Johnson cite the trial record on these issues or explain how the court erred in either of these rulings. (*See* Gov't Resp. Br. 24, 28.) As a result, Johnson has likely waived his right to challenge Brindley's ineffectiveness with respect to these issues. *See United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991).

In any event, the record shows that raising these issues would not have changed the outcome of Johnson's appeal. Johnson does not state his grounds for opposing the prosecution's use of the cell phone picture in his current motion, but when Schindler objected to the picture of cash during the pre-trial hearing, the court recognized that his objections went to the weight of the evidence, not its admissibility. (Pre-trial Conference Tr. 9:13–15:4.) Any chain of custody or foundation objections to the picture or to the cell phone itself would have been frivolous; Schindler in fact stipulated to chain of custody at trial. (Trial Tr. Vol. 2 at 298:20–300:1; Trial Tr. Vol. 3-B at 697:19–25, 707:19–7143:14; Trial Tr. Vol. 4 at 731:10–22.) Even if Brindley truly ignored this issue on appeal, there is no sign that he would have been successful in establishing that this court abused its discretion by admitting the picture. An appeal would have been even less fruitful under a plain error standard—which the Government insists was applicable here given Schindler's

failure to renew his objection at trial. (*See* Gov't Resp. Br. 38) (citing *United States v. Phillips*, 596 F.3d 414, 416 (7th Cir. 2010)); *but see Wipf v. Kowalski*, 519 F.3d 380, 385 (7th Cir. 2008) (parties do not ordinarily need to renew objection to preserve a claim of error for appeal).

Johnson clearly disagrees that the bills in the picture are the proceeds of the December 22nd robbery. Trial counsel had the opportunity, however, to question the bank teller and FBI Agent Ferguson about the denominations that were taken and let the jury draw their own conclusions about whether the picture depicted Johnson's spoils. (Trial Tr. Vol. 233–247; Trial Tr. Vol. 4 at 744–759.) He said the same thing to the jury during his closing argument. The jury rejected it and unanimously convicted Johnson of the December 22nd robbery. Contrary to Johnson's assertions, the bills shown are not so obviously different from those handed over to the robber that the prosecution can be accused of knowingly misleading the jury. *(See, e.g.,* Motion for New Trial 13–14.) For the vast majority of the cash in the photo, the denominations are not clearly visible. Johnson hangs his challenge on the fact that the teller, Hamzic, never said that she gave the robber any $5 bills. But, as the court observed at trial, though Hamzic once stated that she remembered giving the robber 50s, 20s, 10s, and 1s, it was possible that the robber got away with other bills as well. (*See* Trial Tr. Vol. 4 at 759–59) (discussing the report from Hamzic's FBI interview which was not admitted at trial). Neither TCF Bank nor the FBI ever made a precise accounting. Nor was this picture the only piece of evidence linking Johnson to that robbery: the bank's surveillance cameras, O'Neal's identification, and Prince's testimony all signaled Johnson's involvement. Even if admission of the photo was error, that error was harmless.

Concerning Juror No. 2, this court thoroughly explained its reasons for excusing her: Juror No. 2 repeatedly stated that she would likely fall asleep during trial and expressed a "very grave unwilling demeanor" towards the proceedings. (Trial Tr. Vol. 1-B at 177:7–20.) As the Court of Appeals has stated, "[i]f the record shows some legitimate basis for the decision to replace a juror, there is no abuse of discretion." *United States v. Hicks*, 635 F.3d 1063, 1068 (7th Cir. 2011)

(quoting *United States v. Warner*, 498 F.3d 666, 689 (7th Cir. 2007)).  Although Johnson notes that Juror No. 2 was one of only a handful of African-Americans in the jury pool, he does not (nor could he reasonably) argue that the prosecution's objection was pretextual.  The dismissal of a single African-American juror for cause from the jury pool does not by itself establish a violation of his right to an impartial jury.  *See United States v. Russell*, 483 Fed. Appx. 585, 586–87 (7th Cir. 2012) ("[Petitioner's] argument that one prospective juror who did not sit on his jury *would* have been unbiased does not establish a violation of his constitutional rights . . . these rights are satisfied as long as a defendant is tried before a 'qualified jury composed of individuals not challengeable for cause.'") (quoting *Rivera v. Illinois*, 556 U.S. 148, 157 (2009)).

Johnson devotes much more ink to addressing Brindley's failure to argue on appeal that the Facebook ruling violated Johnson's right to compulsory process.  Putting aside the question of whether the Stored Communications Act theoretically violates the Sixth Amendment, Johnson's argument that it had an impact on the trial makes little sense.  Facebook moved to quash the subpoena for evidence on O'Neal's Facebook page, but Johnson got all the information he requested from O'Neal herself.  This information proved exactly what Johnson wanted it to prove: there was no link to a new story about the robberies posted on her wall.  O'Neal continued to assert that the link had once been present and had somehow disappeared, but Schindler's effectively impeached her on that score.  Johnson's overall goal was to suggest that O'Neal was lying about his involvement in the robberies "out of spite, rather than personal knowledge."  (*See* Def.'s 2255 Mot. 11; Def.'s Reply Br. 11–12.)  In that goal, he succeeded:  O'Neal did not hide the fact that Johnson cheated on her and destroyed her property, or that they fought and broke up during the time period in which the robberies occurred.  She may have minimized her hard feelings about Johnson, but Schindler could, and did, cross-examine her in an effort to undermine that impression.  The only relevant use of the Facebook evidence (or, rather, lack thereof) was to show that O'Neal lied about how and when she first learned of the charged robberies—something that was, at best, tangential to the more important question of whether she could accurately

identify Johnson in the surveillance photographs. Even if this court were to discount O'Neal's testimony entirely, there is no likelihood that the result would have changed in light of the ample evidence of Johnson's guilt from other sources.

As a final note, although the Seventh Circuit has not yet addressed this exact issue, the Second Circuit recently rejected a similar challenge against Facebook in *United States v. Pierce*, 785 F.3d 832 (2d Cir. 2015). The *Pierce* court declined to address the constitutionality of the SCA; instead, it held that the defendant failed to show any injury from Facebook's refusal to comply because "[he] possessed the very contents he claims the SCA prevented him from obtaining[.]" *Id.* at 842.[8] The defendant in *Pierce* utilized a private investigator to access a person's Facebook wall rather than subpoenaing the account holder directly, as Johnson did, but he, too, introduced the relevant information into evidence and cross-examined the account holder at trial. *Id.* For the same reasons, this court concludes Brindley did not act unreasonably by failing to present such a weak argument on appeal.

Finally, despite Johnson's insistence that Brindley's conduct before the Court of Appeals contributed to its adverse ruling, there is no basis for suspicion that the court's decision on Johnson's appeal was influenced by Brindley's violations of the Federal Rules of Appellate Procedure. In fact, the court took care to separate the substantive portions of its opinion from its criticism of Brindley. *See Johnson*, 745 F.3d at 230–31. After ruling against Johnson, the court said that Brindley made it "unduly hard for us to access the materials necessary for disposition." *Id.* But the Court of Appeals eventually received the transcript in question and relied on it to hold that this court did not err in concluding that the FBI's photo array was not suggestive. *Id.* at 229–31. Brindley's "deliberate deceit" did not influence the outcome of Johnson's appeal. *Id.* at 232.

---

[8] Despite the Second Circuit's holding in *Pierce*, Johnson "submits that the [Seventh Circuit] Court of Appeals would likely have agreed with him and remanded for a new trial." (Def.'s Reply Br. 11.) Johnson does not cite any case law to support his confidence in the Seventh Circuit's hypothetical ruling.

Brindley's conduct, though obviously troubling, is best described as an attempt to rig the proceedings *in Johnson's favor*. Brindley prevaricated about the transcript and created the impression that this court's decision "was wholly arbitrary." *Id.* at 231. This court does not condone this kind of gamesmanship, but it would be curious to describe Brindley's tactics as prejudicial to his client—if successful, they would have helped Johnson, not hurt him. The fact that the Court of Appeals saw through Brindley's statements merely put Johnson back on a level playing field. Johnson's argument has an obvious logical flaw: a ruling that an attorney is ineffective for breaking the rules to benefit the client would incentivize rule-breaking. The attorney either tricks the court into a favorable ruling, or the client gets a second bite at the apple due to the attorney's misconduct. Courts decline to promote such a result. *See Brewer v. Aiken*, 935 F.3d 850, 859–60 (7th Cir. 1991) (refusing to hold that a lawyer who presented perjured testimony at the request of defendant provided ineffective assistance); *Atkins v. Zenk*, 667 F.3d 939, 946 (7th Cir. 2012) (holding the same when an attorney lied about the defendant's whereabouts during his opening statement). Not surprisingly, Johnson fails to cite any case law to support his suggestion that court sanctions for this type of behavior render an attorney's representation *per se* ineffective. (*See* Def.'s Reply Br. 13) (arguing that Brindley's performance "is not entitled to the usual presumption of reasonableness" based on "this additional and unusual factor").)

## CONCLUSION

For the reasons stated, the court denies Johnson's motion [1] for post-conviction relief. Because reasonable jurists could not "debate whether ... the petition should have been resolved in a different manner." *Resendez v. Knight*, 653 F.3d 445, 446 (7th Cir. 2011). Johnson has failed to make a "substantial showing of the denial of a constitutional right" under 28 U.S.C. § 2253(c), and the court declines to issue a certificate of appealability. *Id.* Judgment will enter in favor of the United States.

ENTER:

Dated: July 20, 2018

_____
REBECCA R. PALLMEYER
United States District Judge